# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| ALI MOHAMMED SEMREEN AL-KHAWALDEH and FATIMA SOUAD FANASH AL-KHAWALDEH,<br>*Plaintiffs*<br><br>v.<br><br>BOYD "SKIP" TACKETT and UTILITY AVIATION, INC.,<br>*Defendants* | Case No. 1:20-CV-1079-RP |

## **O R D E R**

Before the Court are Defendants' Motion to Exclude the Testimony of Dr. Allyn Needham, filed September 14, 2021 (Dkt. 74); Defendants' Motion to Exclude the Testimony of Dr. Samy Ayoub, filed October 4, 2021 (Dkt. 78); Defendants' Motion to Partially Exclude the Testimony of William Lawrence, filed November 5, 2021 (Dkt. 86); the Parties' Stipulation, filed October 13, 2021 (Dkt. 83); and the related response and reply briefs. The District Court referred the motions and related filings to the undersigned Magistrate Judge for disposition, pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

### I.   Background

Ali Mohammed Semreen Al-Khawaldeh ("Mr. Al-Khawaldeh") and Fatima Souad Fanash Al-Khawaldeh ("Mrs. Al-Khawaldeh") (together, "Plaintiffs") bring this wrongful death action pursuant to Chapter 71 of the Texas Civil Practices and Remedies Code. Plaintiffs are proceeding in their individual capacities and on behalf of the estate of their deceased son, Ahmed Ali

1

Mohammed Khalif Al-Khawaldeh ("Ahmed"), a special forces helicopter pilot with the Jordanian Air Force who died in a helicopter crash in Granger, Texas.

On April 13, 2018, the United States Army executed a contract with Brunner Aerospace, LLC ("Brunner"), a private aviation company headquartered in Georgetown, Texas, to provide flight training services to Jordanian military pilots as part of the Army's Security Assistance Training Management Organization program (the "Contract"). Dkt. 47-4. Plaintiffs allege that Brunner's subsidiary, Utility Aviation, Inc. ("Utility"), also headquartered in Georgetown, Texas, was responsible for developing, implementing, and operating the flight training program (the "Training Program"). Defendants dispute this and contend that Brunner was the entity in charge of the Training Program.

Al-Khawaldeh was one of the Jordanian pilots participating in the Training Program. He was receiving "MD530 Emergency Refresher Training (Enhanced)" for special operations pilots who flew MD-530F helicopters with the Jordanian Air Force. Dkt. 45-4 at 1.

On August 21, 2018, at approximately 12:08 p.m., Ahmed and flight instructor Michael Hawley departed Georgetown Municipal Airport on board Hughes Helicopter 369FF for a training exercise. The National Transportation Safety Board (NTSB) Aviation Accident Factual Report shows that about four minutes after departure, Hawley requested a frequency change and began to descend. Dkt. 45-4 at 2. Radar recorded the helicopter traveling at a groundspeed of 90 knots and at altitudes that varied between 0 and 120 feet above ground level over unpopulated areas. *Id.* Around that same time, a witness who was at his home in Granger observed a helicopter "rapidly approach his house from the northwest, flying low over a field, about 30 to 40 [feet above ground level], in a nose-down attitude" and became concerned that the helicopter might collide with his house. *Id.* at 2-3. The witness reported that the helicopter quickly climbed up and over power lines

2

that bordered his street and flew out of his view. *Id.* at 3. The helicopter then hit a power line and crashed in a cotton field a few miles from the witness' residence, killing both Ahmed and Hawley.

Plaintiffs allege that Hawley negligently engaged in an unauthorized high-speed, low-level "nap-of-the-earth flight" (NOE flight)[1] that was the proximate cause of the helicopter crash and Ahmed's death. Dkt. 31 ¶ 12. Plaintiffs assert negligence and gross negligence against Utility and its president, Boyd A. "Skip" Tackett.

In these Motions, Defendants ask the Court to exclude the opinions and testimony of three of Plaintiff's expert witnesses, Dr. Allyn Needham, Dr. Samy Ayoub, and William Lawrence, under Federal Rule of Civil Procedure 702. Plaintiffs oppose all three motions.

## II. Legal Standards

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that scientific testimony or evidence is not only relevant, but also reliable. Subsequently, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness

> qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting FED. R. EVID. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

---

[1] "Nap-of-the-earth flights "are a very low-altitude flight course used in military operations to avoid enemy detection and attack in a high-threat environment." Dkt. 31 ¶ 12 n.1.

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594-95). The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). Because the *Daubert* test focuses on the underlying theory on which the opinion is based, the proponent of expert testimony need not prove that the expert's testimony is correct, but rather that the testimony is reliable. *Moore*, 151 F.3d at 276. This determination of reliability includes a preliminary determination "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Trial courts ordinarily apply four factors when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability is flexible, and these factors "neither necessarily nor exclusively apply to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. "Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *U.S. v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (internal quotations and citations omitted).

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. It is not the court's role to "judge the expert conclusions themselves." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018).

### III.   Dr. Allyn Needham

Plaintiffs have designated Dr. Allyn Needham, Ph.D., an economist and certified earnings analysist, as a damages expert to testify about the economic loss Plaintiffs suffered and will suffer as a result of the death of their son and the loss of his earning capacity. Dr. Needham issued his Original Expert Report on August 2, 2021 (Dkt. 74-1), opining that Plaintiffs' lost economic support due to Ahmed's death would be $460,000 if based on Jordanian bond and inflation rates, and alternatively $648,644.57 if based on U.S. Treasury bonds and inflation rates. *Id.* at 7. After one of Defendants' experts criticized Dr. Needham's calculations of lost economic support because he failed to account for Plaintiffs' life expectancies, Dr. Needham issued a Rebuttal Report on September 16, 2021. Dkt. 76-2. Dr. Needham's Rebuttal Report reduced the amounts of Plaintiffs' lost economic support to $252,900.36 when based on Jordanian bond and inflation rates, and to $289,353.28 when based on U.S. Treasury bonds and inflation rates. *Id.* at 5.

In their Motion, Defendants argue that Dr. Needham's expert testimony should be excluded under *Daubert* and Rule 702 because (1) his loss of support calculations include support for beneficiaries who cannot recover under Texas law, (2) he fails to account for the Plaintiffs' life expectancies in his calculation of lost economic support, and (3) his alternative damages model improperly is based on American, instead of Jordanian, prospective investments. On October 13,

5

2021, the parties filed a Stipulation notifying the Court that they have resolved their dispute as to accounting for the Plaintiffs' life expectancies in the calculation of lost economic support. Dkt. 83. Accordingly, that issue is now moot. The Court addresses each of the remaining arguments in turn.

### A. Beneficiaries Under the Texas Wrongful Death Statute

As noted, Plaintiffs, as parents of the deceased, bring this suit under the Texas Wrongful Death statute ("TWDS"), TEX. CIV. PRAC. & REM. CODE ANN. § 71.002(b) (West 1985), which provides that "a person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default." Under that statute, a plaintiff is entitled to "damages in an amount proportionate to the injury resulting from the death." *Id.* § 71.010(a). In addition, a wrongful death claim may only be brought by "the surviving spouse, children, and parents of the deceased." *Id.* § 71.004(a). Siblings are not entitled to bring wrongful death claims under the statute.[2] Thus, Ahmed's siblings are not entitled to any direct damages in this case. *See id.* § 71.010(b) ("The damages awarded shall be divided, in shares as found by the jury in its verdict, among the individuals who are entitled to recover and who are alive at that time.").

In his Original Expert Report, Dr. Needham defines "lost economic support" as "the amount remaining to supply support to his family after income taxes and personal consumption is subtracted." Dkt. 74-1 at 4. Personal consumption is defined as "the portion of income Captain Al-

---

[2] *See Aguillard v. McGowen*, 207 F.3d 226, 231 (5th Cir. 2000) (recognizing that under Texas law, siblings of decedent do not have standing to bring a wrongful death action); *May v. City of Arlington, Texas*, No. 3:16-CV-1674-L, 2018 WL 1569888, at *9 (N.D. Tex. Mar. 30, 2018) ("A sibling is not one of the persons authorized to bring a wrongful death claim in her individual capacity under the statute."); *Godfrey v. BP Prod. N. Am., Inc.,* No. 14-08-00857-CV, 2009 WL 2589476, at *1 (Tex. App.—Houston [14th Dist.] Aug. 25, 2009, no pet.) (holding that siblings are not permitted to sue under the wrongful death statute and noting that "the Wrongful Death Act reflects the public policy of Texas as determined by the Texas legislature and courts must read the legislature's words as enacted, not revise them as desired"); *Hogan v. Hearst Corp.*, 945 S.W.2d 246, 252 (Tex. App.—San Antonio 1997, no writ) ("Surviving siblings of the deceased do not have standing to bring a wrongful death action.").

Khawaldeh would have spent on himself." *Id.* Dr. Needham determined that Ahmed's personal consumption rate was 25%, based on a "statement" from his family alleging that "75% of [Ahmed's] salaries were spent as supports for his father, mother, brothers, and sisters, during his military service." *Id.* at 5. In his deposition, Dr. Needham acknowledged that he did not know how much of Ahmed's salary went to support his siblings, as opposed to his parents. Needham Dep. 53:6-15; Dkt. 74-2. Dr. Needham further testified that he did not know how many siblings Ahmed had, their ages, or their economic status. *Id.* at 29:10-20.

Based on these statements, Defendants argue that Dr. Needham's calculations are unreliable and irrelevant because he includes damages to Ahmed's siblings, who are not entitled to damages under the TWDS. The Court finds this criticism misplaced because, as Dr. Needham clarified in his Rebuttal Report, his "calculations assume the economic support went to the parents who were then responsible for the handling of the funds in the way they saw fit." Dkt. 76-2 at 4. Dr. Needham explains that he made the assumption that Ahmed's economic support would go to the parents and not the siblings based on his discussions with Dr. Samy Ayoub, Ph.D., Plaintiff's designated expert on Middle Eastern and Islamic law and culture. *Id.* As explained in detail in Dr. Ayoub's Expert Report, under Jordanian law and culture, support obligations go to the parents, not the siblings. *Id.* Dr. Needham explained that while Ahmed's "parents may have used some of the money they received from [Ahmed] to pay for living expenses that also benefited their children who live with them . . . that was the parents' decision." *Id.* Based on the foregoing, the Court finds that Dr. Needham's calculations are not unreliable and irrelevant, as Defendants argue.

The Court further finds that Defendants' criticisms of Dr. Needham's damage calculations go to the weight of his testimony rather than its admissibility. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather

7

than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987); *see also Koenig v. Beekmans*, No. 5:15-CV-0822-OLG, 2017 WL 7732833, at *4 (W.D. Tex. Aug. 16, 2017) (stating that "challenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility").

### B. Alternative Damages Model Based on American Investment Profile

Defendants next argue that Dr. Needham's alternative damages model based on American investments is not admissible because Plaintiffs, who are Jordanian and live in Jordan, are "extremely unlikely to invest" in the United States. Dkt. 74 at 8. In his Rebuttal Report, Dr. Needham explains why he included an alternative damages model based on American investments:

> I used U.S. bond and inflation rates because Jordanian bonds are non-investment grade securities, similar to junk bonds. These bonds fail to meet the safest and best, risk-free rate courts expect experts to use when discounting future losses. Because this case is being tried in the U.S., I relied on U.S. rates because they are risk free and relate directly to the country in which the trial is being held.

Dkt. 76-2 at 4.

The Court finds that Defendants' objections to Dr. Needham's opinions are the proper subject of cross-examination and not a basis for disqualification. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) ("The fact-finder is entitled to hear [the expert's] testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate."); *Nat'l Oilwell DHT, L.P. v. Amega W. Servs., LLC*, No. 2-14-1020, 2020 WL 1692959, at *2 (E.D. Tex. Apr. 7, 2020) (concluding that defendant's "concerns about the document's accuracy is not a basis for excluding [expert's] testimony at trial"). As stated above, "[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Accordingly, Defendants' Motion to Exclude Testimony of Dr. Allyn Needham (Dkt. 74) is **DENIED**.

### IV.   Dr. Samy Ayoub

As noted, Plaintiffs have designated Dr. Samy Ayoub, Ph.D., an Assistant Professor of Law and Middle Eastern Studies at The University of Texas at Austin and The University of Texas School of Law, to testify about "(1) Islamic cultural expectations for family support that would have been provided by the Deceased; and (2) Inheritance rules in Jordan governing the designation of heirs, their shares in the succession and devolution of the estate." Dkt. 75 at 2. Dr. Ayoub specializes in Islamic law and culture and has "devoted particular attention to the question of family and divorce law in the Islamic tradition." Dkt. 76-1 at 3. Dr. Ayoub opines in his Expert Report that: (1) "The decedent's parents are entitled to financial support from the decedent based on his lucrative and highly sought-after career. This is established by both Jordanian law and culture."; and (2) "The inheritance should be distributed between the decedent's parents. Siblings will not be legally entitled to any shares of the estate. The parents are free to dispose of their estate shares in any way they like." *Id.* at 4. In support, Dr. Ayoub explains that:

> Islamic and tribal traditions adopt a collectivist approach to family support. This support is mandated for first-degree family members on ethical, religious, and legal grounds. Parents have the right to be looked after by their adult children, and to receive financial help as necessary, especially in their old age. This norm has been codified in most civil law jurisdictions in the region, such as in Egypt, Iraq, and Syria.

*Id.*

Based on his review of Plaintiffs' answers to Interrogatories and Requests for Production, a summary of Ahmed's annual salary, a financial support statement by Ahmed's father regarding

the support Ahmed provided before the crash, Ahmed's military service benefits, and an inheritance document, Dr. Ayoub opines that

> the parents of the decedent, Mr. Al-Khawaldeh, were receiving financial support from their son. The expectations of support by the parents—which usually include medical, financial, and housing maintenance—are in line with both cultural norms and legal mandates in Jordan. The parents of the decedent, Mr. Al-Khawaldeh, disclosed that they were receiving 75% of his salary. I expect this level of support would have continued if Mr. Al-Khawaldeh were still alive.

*Id.*

Defendants do not dispute that Dr. Ayoub is a qualified expert in Islamic law and culture. Dkt. 78 at 3. Nevertheless, Defendants argue his testimony on the law and culture of Islam, and Jordan in particular, should be excluded because "there is little, if any, precedent for permitting such testimony in the context of wrongful death damages, and Dr. Ayoub's opinions, even if generally applicable to that culture and society, are not sufficiently tethered to the specific individuals involved in this case to be relevant, reliable, or helpful to the jury." *Id.* at 1. Defendants argue that the evidence of support Ahmed may have provided to his family "is more appropriately testified to by lay witnesses with personal knowledge of the family's practices and living conditions." *Id.* In addition, Defendants argue that the general cultural norms that Dr. Ayoub describes are simply not applicable or helpful to the jury in this particular case.

Rule 702(a) permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to testify if the expert's specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." Despite Defendants' arguments to the contrary, "[n]umerous courts have allowed expert testimony on background material, when cultures or locations would be foreign to a jury." *Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 2604592, at *3 (N.D. Cal. Aug. 23, 2006).

10

In *Vang v. Toyed*, 944 F.2d 476 (9th Cir.1999), for example, the Ninth Circuit considered whether expert testimony was proper in a civil rights case under 42 U.S.C. § 1983 brought by a number of Hmong women who claimed to have been raped by a state employee. The trial court allowed plaintiffs' expert to testify "generally as to the Hmong culture, but [precluded him from testifying] as to his opinion regarding the specifics of this case, such as whether there was a rape or why these particular plaintiffs did not report the rape." *Id.* at 481. The Ninth Circuit found that the trial court did not abuse its discretion in admitting the evidence under Rule 702, noting that "expert testimony on issues of culture properly is admitted when relevant and not unfairly prejudicial." *Id.; see also Dongguk Univ. v. Yale Univ.*, No. 3:08-CV-441-TLM, 2012 WL 1977978, at *8 (D. Conn. June 1, 2012) (admitting expert testimony where background testimony on Korean culture would help the jury better understand statements made in the Korean media); *Mesfun v. Hagos*, No. CV-03-02182-MMM, 2005 WL 5956612, at *8 (C.D. Cal. Feb. 16, 2005) (admitting expert testimony where cultural expert's "knowledge, experience and education qualify her to offer an expert opinion regarding the political, cultural, social, and economic ties that Eritreans in the United States maintain with their homeland"); *U.S. v. Zakaria*, No. WDQ-10-0043, 2010 WL 3895383, at *2 (D. Md. Oct. 1, 2010) (admitting expert cultural testimony where "'cultural norms' of Ghana may be outside the purview and common experience of the jury"), *aff'd*, 469 F. App'x 192 (4th Cir. 2012). In addition, courts have permitted such cultural testimony on the issue of damages. *See Dongguk Univ.*, 2012 WL 1977978, at *8 (finding that cultural expert testimony would aid the jury in understanding non-economic damages).

In support of its argument that the Court should exclude Dr. Ayoub's testimony, Defendants rely on *Hersko v. United States*, No. 13-CV-3255, 2016 WL 6126461, at *2 (S.D.N.Y. Oct. 20, 2016). The facts in *Hersko* are clearly distinguishable from the instant case. In *Hersko*, the plaintiff

attempted to rely on expert testimony from a school principal, with no advanced degrees, who plaintiff described as an expert on "the unique cultural and religious services provided by a Hasidic Jewish mother and wife." The Court found that the plaintiff failed to explain how the proposed expert's "everyday experience coupled with occasional references to two books" was "sufficient to permit her to testify as an expert on the practices and customs of Ultra-Orthodox families and on the impact of a mother's death in these families." *Id.* at 13-14. Unlike *Hersko*, here there is no dispute about Dr. Ayoub's qualifications. In addition, the Court will limit Dr. Ayoub's testimony to general testimony about Islamic culture, as stated below.

Based on the foregoing, the Court will permit Dr. Ayoub to testify that under Jordanian law and culture, parents are entitled to financial support from their children, and are entitled to their children's inheritances. The Court also finds that Dr. Ayoub may testify regarding his opinion that Plaintiffs would continue to receive Ahmed's financial support after his death. While Defendants take issue with the fact that Dr. Ayoub received the documents he reviewed from Plaintiffs' counsel, this does not mean that Dr. Ayoub is not qualified to testify as to those documents. Defendants' objections to Dr. Ayoub's opinions and testimony are the proper subject of cross-examination and not a basis for disqualification. Accordingly, Defendants' Motion to Exclude Testimony of Dr. Samy Ayoub (Dkt. 78) is **DENIED**.

## V.   William Lawrence

Plaintiffs have designated William Lawrence, a retired Colonel in the United States Marine Corps, as their aviation expert. Dkt. 75 at 1. Lawrence served as a Marine Corps aviator from 1966 to 1991 and has accumulated over 5,000 flight hours in more than 140 types, models, and series of aircraft. Dkt. 86-2 at 2. Lawrence attended the U. S. Navy Test Pilot School from 1978 to 1979 and served as an engineering and experimental test pilot for more than 10 years. *Id.* At the time of his retirement, Lawrence was the senior active test pilot in the Marine Corps and in command of

all rotorcraft flight testing for the Navy, Marine Corps, and Coast Guard. *Id.* In addition, Lawrence has spent years flying military aircraft around the world, involving combat in two theatres, and is familiar with flying at extremely low altitudes near the maximum airspeed achievable. *Id.* at 2-3.

Plaintiffs designated Lawrence to testify "about the cause of the crash, the pilot's negligence, nonconformance with the contract specifications and inapplicability of the government contractor defense, the pilots' respective responsibilities, the failure to comply with FAA regulations and aviation safety practices, and survivability of the initial impact." Dkt. 75 at 1-2. In preparing his Expert Report, Lawrence reviewed the description of the crash from the NTSB Factual Report, witness statements, audio form the control tower, documents produced by Defendants during discovery, Defendants' deposition testimony, the contract and lease agreements at issue, and certain court documents. *Id.* at 3.

In his Expert Report, Lawrence opines that the flight at issue was a "[h]igh speed low-level flight was not authorized by the contract, did not comply with FAA regulations, was not in compliance with long-standing aviation safety practices, and was a high-risk regime that served no useful purpose." *Id.* at 11-12. Lawrence further opines that "[low level flight operations were not part of the flight plan on the day of the crash or in the contract between the Jordanian government and Brunner Aerospace or Utility Aviation, Inc., as contractors for the United States." *Id.* at 12. Lawrence also submitted a Rebuttal Report to rebut opinions offered by Defendants' expert Barry Rabe with regard to the significance of the Contract Performance Assessment Report ("CPAR") of the helicopter crash issued by Donald Windsor, Foreign Assistant Specialist with the U. S. Army Security Assistance Training Management Organization, on May 7, 2019. Dkt. 86-3.

In their Motion to Exclude, Defendants ask the Court to exclude Lawrence's opinions and testimony regarding (1) Hawley or Ahmed's intent to violate the training syllabus or to

intentionally engage in a low-level, high-speed flight; and (2) the authorship and truthfulness of the CPAR. The Court reviews each argument in turn.

### A. Testimony as to Intent

Although Lawrence did not opine on Hawley or Ahmed's intent to depart from the Contract specifications in his Expert Report, Lawrence testified in his deposition that "[i]t is my opinion that [Hawley and Ahmed] did intentionally depart from the syllabus." Lawrence Dep. 28:6-7, Dkt. 86-1 at 8. Defendants argue that Lawrence should be precluded from testifying regarding Hawley or Ahmed's intent to violate the training syllabus or to intentionally engage in a low-level, high-speed flight.

Defendants are correct that "[t]he question of intent is a classic jury question and not one for the experts." *Retractable Techs. Inc. v. Abbott Lab'ys, Inc.*, No. 5:05-CV-157, 2010 WL 11531436, at *6 (E.D. Tex. June 18, 2010) (citing *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)). An expert's conclusory assertions regarding a defendant's state of mind or intent are not admissible because "an expert's credentials do not place him in a better position than the jury to draw conclusions about a defendant's state of mind." *Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007); *see also Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (holding that expert's opinions "regarding [sheriff's] state of mind are not admissible").

Here, however, Plaintiffs have clarified in their Response that Lawrence will not offer at trial any testimony or opinions that the pilots intentionally violated the training syllabus or the Contract, or that they intentionally engaged in a NOE flight. Dkt. 87 at 2-3. Instead, Plaintiffs aver that Lawrence will testify as to whether the pilots were engaged in a NOE flight at the time of the accident, instead of an emergency situation as Defendants argue, and whether the pilots complied with the Contract. As noted, in preparing his Expert Report, Lawrence reviewed the description of

14

the crash from the NTSB Factual Report, witness statements, audio from the control tower, documents produced by Defendants during discovery, Defendants' deposition testimony, the Contract and Lease agreements, and certain court documents. Dkt. 75 at 3.

Because the Court finds that Lawrence's testimony is both relevant and reliable, the Court will permit it. *Cf. Empire Fire & Marine Ins. Co. v. Patton*, No. CV-17-02159-PHX-JJT, 2019 WL 11544461, at *3 (D. Ariz. Aug. 26, 2019) (allowing expert testimony where expert "has not testified to whether [driver] ultimately intended to hit Defendant, but whether his driving maneuvers appear to have been undertaken on accident or with intentionality"); *Baham v. Lovorn & Lovorn Trucking, Inc.*, No. 18-8881, 2020 WL 2310390, at *5 (E.D. La. Mar. 11, 2020) (denying motion to exclude accident reconstruction expert where report concluded that "the circumstances surrounding this incident fit an established abnormal pattern of staged accidents, and it is my opinion that the claims arising out of this incident stem from intentional and/or staged acts") (cleaned up); *Vigil v. Michelin N. Am., Inc.*, No. EP-05-CV-001-KC, 2007 WL 2778233, at *3 (W.D. Tex. Aug. 23, 2007) (permitting expert reconstructionist to testify regarding facts, nature, and cause of the accident in question and actions of the driver involved in the accident).

### B. Testimony Regarding the CPAR

Defendants next argue that Lawrence should not be permitted to testify as to the authorship and truthfulness of the CPAR. In the two-page CPAR, Windsor states that the "[c]ontractor met all reporting, contractual requirements, and aviation specific regulations required to ensure training was conducted to Federal Aviation mandated standards as well as Army training specifications and guidelines." Dkt. 86-4 at 4. Defendant's expert Barry Rabe relies on this statement to opine that the Defendants are entitled to the Government Contractor Defense because the Defendants

15

and Hawley did not deviate from the Contract, and that it is mere speculation that the pilots were involved in a NOE flight. Dkt. 87-2 at 8, 10, 12.

In his Rebuttal Report, Lawrence opines that:

> Based on my experience in and knowledge of the process, including the types of information the Assessing Official typically reviews and how the reviews are typically written, it is my opinion that this CPAR neither signifies nor accurately establishes that Utility Aviation or Brunner Aerospace complied with the contract specifications, nor does this CPAR mean that Utility Aviation and Mr. Hawley did not deviate from the contract when the accident flight engaged in nap-of-the-earth (NOE) flying, which was neither called for nor authorized in the contract or training syllabus.
>
> In the military, performance assessments are the "name of the game" in determining whether the person or organization under scrutiny advances or retreats. . . . If the official wants the contract renewed, he or she will sign a report that paints a positive picture of the contractors' performance, even if the official does not have specific knowledge of the particulars of their performance, and even if there may be instances of non-compliance. In fact, it is not uncommon for the contractor itself to do the initial draft of the report, then submitted to the Assessment Official for signature as his or her own.
>
> ***
>
> Mr. Windsor's qualifications as this program's contracting officer does not necessarily include knowledge or qualification relating to the tasks included in the contract. Mr. Windsor appears by his own written qualifications to have had an excellent career as a Special Forces officer, but his qualifications include nothing to do with aviation. It does not appear that Mr. Windsor had the requisite qualifications to analyze the specific training that was occurring or to determine whether the NOE flying was a deviation from the contract specifications. . . . I would be shocked if Mr. Windsor even knows what NOE flight is.
>
> Given the above, it is simply not reasonable to rely on the CPAR as support for the notion that Mr. Hawley or Defendants were complying with the contract specifications when the accident occurred, and therefore Mr. Rabe's opinions depending on the CPAR lack foundation.

Dkt. 86-3 at 2-3.

In his deposition, Lawrence testified that he did not believe Windsor wrote the CPAR and that:

16

> It was written by either Utility Aviation or Brunner Aviation and then sent to him so he could submit it. He could not have written it because he did not know the facts that are contained in it. He never went there. He didn't know anything about what they did.
>
> \*\*\*
>
> He signed it, absolutely. But he didn't put the substance into it. The only thing he actually knew about was whether contract payments were made on time, whether the stated terms of the contract in terms of schedule and all of that were completed. That's what he knew because that's what he was responsible for. But in terms of the syllabus being properly completed and how all the pilots and instructors got along, whether the aircraft were properly maintained and whether they had enough aircraft and whether they were equipped properly or not, he absolutely knew nothing about that.

Lawrence Dep. 43:18-25, 46:12-23; Dkt. 86-1 at 12-13. Lawrence further testified that he believed that Defendants wrote the Parties' Contract. *Id.* at 44:1-3; Dkt. 86-1 at 12.

Defendants argue that Lawrence's opinions related to the CPAR are based on "nothing more than his subjective belief and unsupported speculation." Dkt. 86 at 10. While the Court agrees that Lawrence's opinions on who wrote the parties Contract is outside his area of expertise, the Court finds that Lawrence's opinions as to the truthfulness of the CPAR are relevant and reliable, based on his specialized experience and knowledge of the industry. In addition, Defendants opened the door to this testimony by relying on the CPAR in Rabe's expert report. Questions relating to the bases and sources of an expert's opinion, moreover, affect the weight to be assigned that opinion, rather than its admissibility. *Viterbo*, 826 F.2d at 422.

Accordingly, Defendants' Motion to Partially Exclude the Testimony of William Lawrence, (Dkt. 86) is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** the Motion to Exclude Lawrence's testimony as to who wrote the Parties' Contract, but **DENIES** the Motion as to all other testimony.

## VI. Conclusion

In summary, Defendants' Motion to Exclude Testimony of Dr. Allyn Needham (Dkt. 74) and Defendants' Motion to Exclude Testimony of Dr. Samy Ayoub (Dkt. 78) are **DENIED**. Dr. Ayoub may offer general expert testimony about Islamic culture, specifically that under Jordanian law and culture, parents are entitled to financial support from their children and are entitled to their children's inheritances. Dr. Ayoub also may testify regarding his opinion that Plaintiffs would continue to receive Ahmed's financial support after his death.

Defendants' Motion to Partially Exclude the Testimony of William Lawrence (Dkt. 86) is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** the Motion to Exclude William Lawrence's testimony as to who wrote the Parties' Contract, but **DENIES** the Motion as to all other testimony.

**SIGNED** on December 14, 2021.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE